JUDGE ENGELMAYER   **13 CIV 4068**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

THE DEAL, L.L.C.

                    Plaintiff,

        v.

DEALDRIVE INC.

                    Defendant.

Civ. No. _____

<u>**VERIFIED COMPLAINT**</u>

**JURY TRIAL DEMANDED**

RECEIVED
JUN 13 2013
U.S.D.C. S.D. N.Y.
CASHIERS

---

Plaintiff THE DEAL, L.L.C. ("The Deal" or "Plaintiff"), by its attorneys, Orrick,

Herrington & Sutcliffe LLP, alleges as and for its Verified Complaint against Defendant

DEALDRIVE INC. ("Dealdrive" or "Defendant") as follows:

## NATURE OF THE CASE

1.     This is an action by Plaintiff The Deal to prevent and restrain Defendant

Dealdrive's unauthorized and infringing misappropriation of The Deal's registered, well-known,

and distinctive service mark, THE DEAL PIPELINE. Since July 2008, Plaintiff has operated a

web-based information and news service called "The Deal Pipeline." "The Deal Pipeline"

targets bankers, lawyers, corporate dealmakers, private equity professionals, hedge funds, and

institutional investors as well as other professionals in the finance, legal, and business

communities. It provides a wide variety of information and insights on matters of interest to the

financial community, including breaking news, daily and weekly updates, and a research center

containing searchable historical data about prior transactions. In 2009, Plaintiff registered its

THE DEAL PIPELINE mark with the United States Patent and Trademark Office. Through its

continuous use and Plaintiff's promotional efforts, THE DEAL PIPELINE mark has come to

signify a well-known and highly regarded "go-to" resource in the investment community. Without Plaintiff's consent or authorization, Defendant Dealdrive has recently begun marketing and promoting a software platform and application called "dealpipeline." This software, just like "The Deal Pipeline," is intended for the investment community and is described by Defendant as a "prospective investment tracking tool."

To avoid inevitable confusion and deception of consumers and to prevent Defendant's willful intent to trade on Plaintiff's goodwill, Plaintiff here asserts claims for trademark infringement under Section 32(1) of the Lanham Act (15 U.S.C. § 1114); trademark infringement, unfair competition, and false designation of origin pursuant to Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)); and for the related claims of infringement, dilution, deceptive business practices, and unfair competition under the statutory and common law of New York. Plaintiff seeks preliminary and permanent injunctive relief to prevent Defendant from using Plaintiff's THE DEAL PIPELINE mark in any way and to prevent Defendant from profiting from Plaintiff's goodwill and further seeks compensatory and punitive damages and attorneys' fees resulting from Defendant's infringing acts.

## THE PARTIES

2.      Plaintiff The Deal is a limited liability company duly organized under the laws of the state of Delaware with its principal place of business at 14 Wall Street, New York, NY 10005. 100% of the equity interest of The Deal is owned by TheStreet, Inc. ("TheStreet"), a leading digital financial media company whose network of digital services—one of which is The Deal—provides users, subscribers, and advertisers with a variety of content and tools through a range of online, social media, tablet, and mobile channels.

2

3.     Defendant Dealdrive is a for-profit corporation organized under the laws of the state of Delaware with its principal place of business located at 250 Park Avenue, 7th Floor, New York, NY 10177.  Upon information and belief, Defendant is a mobile software company that develops software platforms and applications for use by investment professionals.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a), 1338(b), and pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

5.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) in that a substantial part of the events giving rise to the claim occurred in this district and in that Defendant may be found in this district.

6.     This court has personal jurisdiction over Defendant in this action by virtue of its acts and omissions that have taken place in the state of New York and are designed to, and are, causing substantial confusion and deception among consumers in New York and irreparable injury to Plaintiff's valuable reputation, goodwill, trademarks, and other intellectual property assets in New York.  Upon information and belief, Defendant's principal place of business is located in New York, it has been qualified to do business in New York since May 13, 2013, and the majority of its development, marketing, and sales activities takes place in New York.

## THE DEAL AND "THE DEAL PIPELINE"

7.     The Deal was founded in March 2000 with a mission to provide transaction information services, including commentary and data that cover the world of finance and business through the lens of deal making.  Since its inception, The Deal's content has focused on core areas including mergers & acquisitions, private equity, venture capital financings,

3

bankruptcies, and other topics of interest to the investment banking, private equity, legal, hedge fund, and venture capital industries. Specifically, The Deal defines its audience as including bankers, lawyers, corporate dealmakers, private equity professionals, hedge funds, capital markets professionals and institutional investors who seek sophisticated insight and analysis on various types of deals from their inception through maturity to integration.

8.   The Deal has long been known within the investment, financial, legal, and business communities as a highly regarded "go-to" source for information pertaining to noteworthy deals. *The New York Times* has described The Deal as the "publisher of a longtime bible of the mergers industry."

9.   Currently, The Deal's primary service is its web-based transaction information platform called "The Deal Pipeline," which was originally launched in July 2008 and is available on the Internet at www.thedealpipeline.com as well as at www.thedeal.com.

10.   The Deal has been using THE DEAL PIPELINE as a service mark continuously since the launch of "The Deal Pipeline" in July 2008.

11.   As a result of its marketing and promotional efforts as well as its commitment to journalistic excellence, "The Deal Pipeline" is well-known, widely read, and highly regarded in the investment, financial, business, and legal communities.

12.   On August 29, 2008, The Deal filed a trademark application in the United States Patent & Trademark Office in International Classes 36 and 41 for "The Deal Pipeline and Design." That application matured to registration on July 14, 2009 as U.S. Registration No. 3,653,698 and at all times has been owned by the The Deal. The registration is for "providing information in the field of mergers and acquisitions via the Internet; providing online searchable databases of news and information in the field of mergers and acquisitions" in Class 36 and for

4

"providing online magazines and newsletters in the field of mergers and acquisitions" in Class 41.

A true and correct copy of U.S. Registration No. 3,653,698 is attached hereto as Exhibit A.

13.     The Deal also owns the following U.S. Serial Numbers, all filed on June 3, 2013

in the United States Patent & Trademark Office for the mark THE DEAL PIPELINE in standard

character form:

> Class 9, Ser. No. 85/949,097:  Computer application software for tablet devices,
> namely, software for accessing on such devices an online business and financial
> news and information service; downloadable webcasts in the business and
> financial fields; downloadable mobile applications for accessing news,
> information and commentary in the business and financial fields
>
> Class 35, Ser. No. 85/949,110:  Business information and news services and
> searchable databases, provided online and by electronic means; providing news,
> information and commentary in the field of business
>
> Class 36, Ser. No. 85/949,122:  Financial information and news services and
> searchable databases, provided online and by electronic means; providing news,
> information and commentary in the field of finance
>
> Class 41, Ser. No. 85/949,138:  Online magazines and newsletters in the business
> and financial fields; live and online seminars in the business and financial fields;
> providing online publications in the nature of magazines and newsletters in the
> fields of business and finance; providing webcasts in the field of business and
> finance; providing electronic newsletters in the field of business and finance
> delivered by e-mail; conducting seminars, conferences, and workshops in the field
> of business and finance and distributing course materials in connection therewith

14.     The entirety of The Deal's content is currently available only through its "The

Deal Pipeline" platform.  Some of the specific products and services available through "The Deal

Pipeline" include a breaking news service called "First Take"; daily and weekly sectors

newsletters; a twice-daily report of the day's top stories called "The Daily Deal"; and a research

center with over a decade's worth of reporting and a database of over 117,000 deals.

15.     "The Deal Pipeline" boasts a significant number of major institutional licensee

subscribers, including the academic libraries of leading universities—such as Harvard University,

Cornell University, and Duke University, to name a few—and global law firms, hedge funds,

institutional investors, and financial institutions—including Bank of America and Lazard. Through these institutional subscribers, "The Deal Pipeline" has a marquee customer base of approximately 40,000 professionals, including senior-level bankers, law firm partners, private equity partners, and hedge fund notables.

16.     "The Deal Pipeline" is also available to subscribers of certain Lexis online information database services.

17.     In addition, "The Deal Pipeline" is available to certain subscribers through an exclusive iPad app called "The Deal Pipeline," which was first launched in January 2012. Features currently offered through the iPad app include IPO Center powered by NYSE Euronext; PDF reports of The Daily Deal, Corporate Control Alert, The DealFlow Report, and The Life Settlements Report; and video interviews with top dealmakers.

18.     "The Deal Pipeline" has received a wide array of sponsorships from financial institutions, law firms, publicly traded corporations, and accounting firms, including Capital One Bank, Debevoise & Plimpton LLP, Intralinks, Inc., Morrison & Foerster LLP, The NASDAQ OMX Group, Inc., Pepper Hamilton LLP, PricewaterhouseCoopers LLP, and R.R. Donnelley & Sons Company. Such sponsorships are displayed prominently on "The Deal Pipeline" website.

19.     Companies routinely tout any appearances that they or their employees make on "The Deal Pipeline" by issuing press releases highlighting such coverage. Such press releases generally link to the relevant "The Deal Pipeline" article or webcast and give a summary of the coverage contained therein. Law firms that have issued such press releases in the past three years include Sullivan & Cromwell LLP, BakerHostetler LLP, Alston & Bird LLP, Wilson Sonsini Goodrich & Rosati P.C., O'Melveny & Myers LLP, and Shearman & Sterling LLP, to name a few.

6

20.     The Deal's sales team aggressively promotes "The Deal Pipeline" at targeted industry events and pursues media sponsorship arrangements to raise awareness of the "The Deal Pipeline" brand.

21.     Research and editorial content appearing in "The Deal Pipeline" is regularly cited by journalists in third-party industry and financial publications.  Recent examples of publications that have cited to content originally published in "The Deal Pipeline" include *The Fiscal Times*, *Radio Ink* magazine, and *FiercePharmaManufacturing*.

22.     The Deal hosts an annual invitation-only conference called "The Deal Economy," which is attended by over 200 top dealmakers, including bankers, private equity leaders, hedge fund investors, corporate development officers.  One of The Deal's primary purposes in hosting "The Deal Economy" is to showcase and promote "The Deal Pipeline" to attendees.  Recent "Event Underwriters" for the conference have included Ernst & Young LLP, McKinsey & Company, William Blair and Company, and W. P. Carey.

23.     In September 2012, The Deal was acquired by TheStreet, a publicly traded digital finance media company.  The acquisition was widely reported in national media, including in *The New York Times* and the *Wall Street Journal*.  As reported at the time of the acquisition, TheStreet's primary interest in The Deal was "The Deal Pipeline," which TheStreet saw as a valuable asset, as it provided TheStreet access to private equity and investment banking professionals.

24.     As a result of The Deal's long time use of THE DEAL PIPELINE mark, its widespread promotional campaigns and press coverage, as well as its emphasis on maintaining sponsorship and collaborative relationships with leading corporations and firms, The Deal has

7

generated an incalculable amount of goodwill in its THE DEAL PIPELINE mark within the investment, business, finance, and legal communities.

25.     Through Plaintiff's continuous and exclusive use of its THE DEAL PIPELINE mark since July 2008 and its corresponding USPTO registration of THE DEAL PIPELINE and design, Plaintiff has established ownership of the THE DEAL PIPELINE mark and the exclusive right to use that mark in interstate commerce in connection with the financial information services that it offers.

26.     Plaintiff's THE DEAL PIPELINE mark is inherently distinctive.  Additionally, through its continuous and extensive use over the past nearly five years, the mark has come to signify, identify, and distinguish Plaintiff as the source of high-quality and respected transaction information services.  As such, Plaintiff's THE DEAL PIPELINE mark also has acquired distinctiveness and secondary meaning in the minds of the public, and particularly in the United States investment, business, and legal communities.

## DEALDRIVE AND ITS "DEALPIPELINE" SOFTWARE PLATFORM

27.     Upon information and belief, Dealdrive was incorporated on or around August 17, 2012.

28.     According to its website (www.dealdrive.com), Dealdrive is "a mobile software company that develops industry best practice applications to enhance the productivity, efficiency, and decision-making abilities of investment professionals."  Dealdrive specifically targets "institutional investors" including "private equity, venture capital, and lenders."

29.     Also according to its website, Dealdrive's mobile business productivity software is designed to assist investment professionals, corporate board members, and corporate executives "in tracking deals, managing due diligence processes and monitoring portfolio

8

company performance." Dealdrive describes its mission as "to simplify the lives of our clients by providing easy, immediate access to key information so they can be more efficient and productive in the management of their time and investment organizations."

30. Upon information and belief, Dealdrive has developed a software platform and application called "dealpipeline" that is meant to be a "prospective investment tracking tool." Dealdrive's website states that "dealpipeline" "helps record, profile, and keep all investment pipeline activity organized and easily viewable for those weekly deal review meetings. The program also provides advanced reporting features for active intelligence on when and from whom deals are sourced, to-do lists, tasks, and investment stage processes." The software is "[m]ade for tablet/laptop devices."

31. Upon information and belief, on December 31, 2012, Dealdrive filed an intent-to-use trademark application with the United States Patent and Trademark Office for the trademark "dealpipeline and design" in International Class 9 for "Cloud computing software for use in managing deal pipelines for investment firms." As of the filing of this Complaint, Dealdrive's trademark application is still pending and has not yet been published for opposition.

32. Plaintiff has not consented to, sponsored, endorsed, or approved Defendant's use, or attempted registration, of "dealpipeline."

33. Based on appearance, sound, and meaning, "dealpipeline" is virtually identical to Plaintiff's THE DEAL PIPELINE mark.

34. Because both The Deal and Dealdrive target members of the investment and business community, including institutional investors, private equity, capital markets professionals and venture capital entities, the class of consumers that the companies market and sell to is the same.

9

35.     Both "The Deal Pipeline" and Dealdrive's "dealpipeline" are offered (or in the case of Dealdrive's "dealpipeline," expected to be offered) through software applications for "tablet/laptop devices."

36.     Upon information and belief, the functionality and content of Defendant's "dealpipeline" software substantially overlaps with that of "The Deal Pipeline," which similarly serves as a tracking tool for investment activity.  For example, customers of the "The Deal Pipeline" have access to various databases, league tables, and other research and tracking tools that The Deal provides for purposes of tracking investment activity.

37.     Additionally, upon information and belief, Dealdrive's "dealpipeline" product is marketed through the Internet and on Dealdrive's website.

38.     "The Deal Pipeline" is a web-based service.  The Deal markets its "The Deal Pipeline" services on the Internet and through in person meetings and events and phone outreach. It also markets directly by e-mail to approximately 100,000 individuals on a weekly basis.

39.     The channels through which "The Deal Pipeline" and the "dealpipeline" application are marketed, sold, and made available to consumers are the same.

40.     Defendant's use of a mark virtually identical to Plaintiff's THE DEAL PIPELINE mark in the same channels of trade on similar products directed at the same consumers is likely to cause confusion, mistake, or deception among consumers, including subscribers and sponsors, as to the source of services and goods provided and whether they are affiliated with, sponsored by, or otherwise related to Plaintiff and its services.

**PLAINTIFF'S AWARENESS OF DEFENDANT'S INFRINGING USE**

41.     Both The Deal and Dealdrive sponsored InterGrowth 2013 ("InterGrowth"), a conference held in Orlando, Florida from April 22-25, 2013.  InterGrowth was hosted by the

10

Association for Corporate Growth and was meant to provide programming and networking opportunities for middle-market professionals, including private equity executives, investment bankers, lenders, corporate strategic acquirers, privately held business owners, and service providers. Representatives of both companies attended the conference as well.

42.     Upon information and belief, Dealdrive was given table space at InterGrowth as a benefit of sponsorship. Dealdrive used this table space to promote and market its "dealpipeline" software platform and application to InterGrowth's attendees.

43.     Representatives of The Deal actively discussed and promoted "The Deal Pipeline" at InterGrowth to the same individuals, institutions, and organizations targeted by Dealdrive.

44.     Plaintiff first became aware of Defendant's "dealpipeline" software platform and application upon observing Dealdrive's table space at InterGrowth in April 2013.

45.     Upon information and belief, individuals affiliated with Dealdrive have been and are fully aware of Plaintiff's THE DEAL PIPELINE mark and the content and services offered in connection with that mark.

46.     Upon information and belief, an individual named Lisa Helme Danforth is an Advisory Board Member for Defendant. Ms. Danforth was previously an employee of Plaintiff from September 2007 to June 2011, where she actively participated in the promotion and marketing of The Deal's offerings, including "The Deal Pipeline." Upon information and belief, Ms. Danforth acquired actual knowledge of The Deal's rights in its THE DEAL PIPELINE mark when employed by Plaintiff.

47.     Upon information and belief, in selecting and using "dealpipeline" as a trademark, Plaintiff has acted in bad faith in an attempt to trade on Plaintiff's good will.

48.     Despite actual and/or constructive notice of Plaintiff's rights in its THE DEAL PIPELINE mark, Defendant continues to infringe upon Plaintiff's rights in bad faith.

49.     Upon information and belief, Plaintiff has engaged in willful infringement of Plaintiff's trademark rights in THE DEAL PIPELINE.

50.     On April 29, 2013, shortly after becoming aware of Defendant's "dealpipeline" software platform and application at InterGrowth, Plaintiff, through counsel, sent Defendant a cease and desist letter to its New York offices, 250 Park Avenue 7th Floor, New York, NY 10177. A true and correct copy of Plaintiff's April 29, 2013 cease and desist letter ("Plaintiff's April 29 letter") is attached hereto as Exhibit B.

51.     Plaintiff's April 29 letter stated that Dealdrive's use of dealpipeline in branding and promoting its software platform and application was "likely to cause confusion with The Deal's registered *The Deal Pipeline* trademark" and that "there is a strong likelihood that persons familiar with The Deal's established *The Deal Pipeline* service will believe mistakenly that Dealdrive's *dealpipeline* software is associated or affiliated with The Deal's services or that The Deal endorses Dealdrive's software product." The letter requested that Dealdrive "agree to immediately cease its use of the *dealpipeline* trademark and select a new trademark for its software product that is not confusingly similar to The Deal's registered trademark." Further, the letter asked "that Dealdrive abandon its pending trademark application for the *dealpipeline* trademark." Plaintiff's April 29 letter demanded a response by May 6, 2013.

52.     On May 6, 2013, the date by which The Deal required a response to its April 29 letter, Dealdrive issued a press release announcing the launch of its cloud-based mobile software system directed to "investment professionals, board members and company executives" and touting its software applications, including "dealpipeline," designed to provide "easy, immediate

12

access to key information so they can be more efficient and productive in the management of their time and investment organizations."

53.     Defendant, through counsel, subsequently sent a letter to counsel for Plaintiff on May 13, 2013.  A true and correct copy of Defendant's May 13, 2013 letter ("Defendant's May 13 letter") is attached hereto as Exhibit C.

54.     Defendant's May 13 letter purports to refute the allegations set forth in Plaintiff's April 29 letter and further stated that Defendant "will continue to use its own mark for its goods and services, and rejects your request for Dealdrive to abandon its pending trademark application."

55.     On June 4, 2013, counsel for The Deal again reached out to counsel for Dealdrive, this time attaching a draft complaint and requesting once again that the parties attempt to resolve their dispute without the need for litigation.  A true and correct copy of that letter is attached hereto as Exhibit D.  Counsel for Dealdrive did not respond.

56.     Dealdrive's actions have been, and unless enjoined will continue to be, in violation of federal and state law governing trademark infringement and unfair competition and are causing immediate and irreparable harm to The Deal, including blurring and tarnishing of its trademark, loss of control over its reputation, and loss of goodwill.

## COUNT I

## FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114)

57.     Plaintiff repeats and realleges each of the allegations set forth in paragraphs 1 through 55 above as though fully set forth herein.

58.     Defendant has infringed upon Plaintiff's THE DEAL PIPELINE mark through the use of "dealpipeline" in interstate commerce without Plaintiff's authorization or consent.

59.     Defendant's use of "dealpipeline" in interstate commerce in connection with its software platform and application is likely to confuse, mislead, and deceive the class of consumers targeted by both Plaintiff and Defendant as to the origin of the mark.

60.     Defendant's activities described above constitute infringement of Plaintiff's rights in its federally registered THE DEAL PIPELINE mark under 15 U.S.C. § 1114.

61.     Plaintiff has been and continues to be damaged by Defendant's infringement in an amount to be proved at trial.

62.     Defendant's acts are causing and continue to cause Plaintiff irreparable harm in the nature of loss of control over its reputation and loss of substantial consumer goodwill. The irreparable harm to Plaintiff will continue, without any adequate remedy at law, unless and until Defendant's unlawful conduct is enjoined by this Court.

COUNT II

FEDERAL TRADEMARK INFRINGEMENT, UNFAIR COMPETITION,
AND FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

63.     Plaintiff repeats and realleges each of the allegations set forth in paragraphs 1 through 61 above as though fully set forth herein.

64.     Defendant's use of "dealpipeline" in connection with its software platform and application, without the authorization or consent of Plaintiff, constitutes a use in interstate commerce that is likely to cause confusion and mistake and to deceive consumers as to the source or origin of Defendant's services such that consumers may believe that Defendant's goods and services are sponsored by, endorsed by, approved by, licensed by, authorized by, or affiliated or connected with Plaintiff.

65.     By virtue of the foregoing, Defendant's acts are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

14

66.     Plaintiff has exclusively used its THE DEAL PIPELINE mark for nearly five years and has established ownership of the THE DEAL PIPELINE mark and the exclusive right to such mark in interstate commerce in connection with its financial-related and information services.

67.     Plaintiff's THE DEAL PIPELINE mark is inherently distinctive and also has acquired secondary meaning by virtue of The Deal's exclusive use of the mark over the past nearly five years, The Deal's advertising featuring the mark, the large subscriber and sponsor base of "The Deal Pipeline," and the amount of unsolicited media coverage of "The Deal Pipeline."

68.     Upon information and belief, Defendant has intentionally and knowingly adopted and used a name, mark, or false designation of origin likely to cause confusion in the marketplace as to the source, origin, or sponsorship of the goods and services offered by Defendant.

69.     Plaintiff has been and continues to be damaged by Defendant's infringement in an amount to be proved at trial.

70.     Defendant's acts are causing and continue to cause Plaintiff irreparable harm in the nature of loss of control over its reputation and loss of substantial consumer goodwill. The irreparable harm to Plaintiff will continue, without any adequate remedy at law, unless and until Defendant's unlawful conduct is enjoined by this Court.

## COUNT III

## NEW YORK COMMON LAW TRADEMARK INFRINGEMENT

71.     Plaintiff repeats and realleges each of the allegations set forth in paragraphs 1 through 69 above as though fully set forth herein.

15

72. Plaintiff has been using its THE DEAL PIPELINE mark since July 2008 both in New York state and throughout the United States.

73. Through extensive and continuous use, media coverage, and publicity, Plaintiff's THE DEAL PIPELINE mark has become well-known in New York and beyond, and its financial information and news service has earned tremendous goodwill and an outstanding reputation among financial investment and business and legal professionals and individuals located in New York and throughout the United States.

74. Defendant's use of "dealpipeline," without the authorization or consent of Plaintiff, in connection with its software platform and application constitutes a use in commerce that is likely to cause confusion and mistake and to deceive consumers as to the source or origin of Defendant's services such that consumers may believe that Defendant's goods and services are sponsored by, endorsed by, approved by, licensed by, authorized by, or affiliated or connected with Plaintiff.

75. By virtue of the foregoing, Defendant has infringed and continues to infringe upon Plaintiff's THE DEAL PIPELINE mark.

76. Upon information and belief, Defendant has intentionally and knowingly adopted and used a name, mark, or false designation of origin likely to cause confusion in the marketplace as to the source, origin, or sponsorship of the goods and services offered by Defendant.

77. Plaintiff has been and continues to be damaged by Defendant's infringement in an amount to be proved at trial.

78. Defendant's acts are causing and continue to cause Plaintiff irreparable harm in the nature of loss of control over its reputation and loss of substantial consumer goodwill. The

irreparable harm to The Deal will continue, without any adequate remedy at law, unless and until Defendant's unlawful conduct is enjoined by this Court.

## COUNT IV

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 360-I

79.    Plaintiff repeats and realleges each of the allegations set forth in paragraphs 1 through 77 above as though fully set forth herein.

80.    Defendant's use of "dealpipeline," despite Plaintiff's exclusive use and rights in its distinctive THE DEAL PIPELINE mark, has injured and will continue to injure Plaintiff's business reputation and has diluted and tarnished and will continue to dilute the distinctive quality of Plaintiff's strong and distinctive marks by blurring the identity between the Plaintiff's marks and its services or otherwise lessening the capacity of Plaintiff's marks to exclusively identify Plaintiff and its services and/or by tarnishing the positive associations represented by Plaintiff's marks.

81.    Defendant's actions are in violation of New York General Business Law section 360-l and are causing and continue to cause Plaintiff irreparable harm in the nature of loss of control over its reputation and loss of substantial consumer goodwill. This irreparable harm to Plaintiff will continue, without any adequate remedy at law, unless and until Defendant's unlawful conduct is enjoined by this Court.

## COUNT V

### DECEPTIVE ACTS AND PRACTICES UNDER NEW YORK GENERAL BUSINESS LAW § 349

82.    Plaintiff repeats and realleges each of the allegations set forth in paragraphs 1 through 80 above as though fully set forth herein.

83.    Defendant's use of Plaintiff's THE DEAL PIPELINE mark constitutes an

17

unlawful and deceptive act and practice in connection with the advertising, promotion, marketing, distribution, and sale of goods and services in New York.

84.     Defendant's acts, misbranding its services, and misleading consumers, have resulted in and will continue to cause confusion and deception of the public in violation of N.Y.G.B.L. § 349, *et seq.* In particular, members of the investment and business community targeted by both Plaintiff and Defendant are at a high risk of being deceived into believing that Defendant's goods and services possess the same reliability and high-quality that Plaintiff's "The Deal Pipeline" has established.

85.     Defendant's wrongful conduct has caused and will continue to cause irreparable harm and injury to Plaintiff. This irreparable harm will continue, with any adequate remedy at law, unless and until Defendant's unlawful conduct is enjoined by this Court.

86.     Defendant's deceptive trade practices are willful, intentional, and egregious, justifying statutory and treble damages in an amount to be determined at trial, as well as an award of attorneys' fees under N.Y.G.B.L. § 349(h).

## COUNT VI

## NEW YORK COMMON LAW UNFAIR COMPETITION

87.     Plaintiff repeats and realleges each of the allegations set forth in paragraphs 1 through 85 above as though fully set forth herein.

88.     Defendant's use of "dealpipeline," without the authorization or consent of Plaintiff, in connection with its merchandising of goods and services is likely to cause confusion and mistake and to deceive consumers as to the source, origin, sponsorship or affiliation of Defendant's services and constitutes trade name and trademark infringement, unfair competition, and misappropriation of Plaintiff's goodwill and reputation in violation of the laws of the State

of New York.

89.     Upon information and belief, Defendant has used "dealpipeline" in bad faith with the intent to trade off of Plaintiff's goodwill.  Upon information and belief, Defendant adopted this name with full knowledge of Plaintiff's nearly five years of exclusive use.  Despite this knowledge, it decided instead to misappropriate Plaintiff's name and use it as its own.

90.     Plaintiff has been and continues to be damaged by Defendant's unfair competition in an amount to be proved at trial.

91.     Defendant's acts are causing and continue to cause Plaintiff irreparable harm in the nature of loss of control over its reputation, and loss of substantial consumer goodwill.  This irreparable harm to Plaintiff will continue, without any adequate remedy at law, unless and until Defendant's unlawful conduct is enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff The Deal demands judgment against Defendant, as follows:

A.     For a judgment that Defendant has infringed United States Trademark Registration No. 3,653,698, pursant to 15 U.S.C. § 1114, that Defendant is in violation of 15 U.S.C. §1125(a), and that Defendant is liable for the related claims of infringement, dilution, deceptive business practices, and unfair competition under the statutory and common law of New York;

B.     For an order requiring Defendant to deliver to Plaintiff all infringing articles, pursuant to 15 U.S.C. § 1118;

C.     That Defendant, its officers, directors, agents, servants, employees, and attorneys and any and all persons in active concert or participation with Defendant who receives actual

notice hereof by personal service or otherwise, be preliminarily and permanently restrained and enjoined from:

    1.   Imitating, copying or making unauthorized use of the Plaintiff's trademarks or trade name, either standing alone or as part of any other name or mark;

    2.   Using "dealpipeline" or "Deal Pipeline" or any reproduction, counterfeit, copy, colorable imitation thereof, or any words confusingly similar, as a trademark, trade name, domain name or otherwise in connection with the advertising, display, sale, offering for sale or distribution of any products or services in any medium, including but not limited to the Internet, social media, radio, and television, in such a manner that is likely to cause confusion or mistake or to deceive customers or the public or give the impression that Defendant or its products or services originate with, are affiliated with, are sponsored by, approved by or in any way connected to Plaintiff;

    3.   Using as a name or mark "dealpipeline" or "Deal Pipeline" or any variation thereon;

    4.   Using any name, mark or false designation of origin, or false description, or performing any act which can, or is likely to, lead members of the public to believe that any service or product provided by Defendant is in any manner associated or connected with Plaintiff or is sold, licensed, sponsored, approved or authorized by Plaintiff;

    5.   Using "dealpipeline" or "Deal Pipeline" as a metatag or in any hidden data, as a website address, as a social media identifier or hashtag, including but not limited to, in conjunction with any Internet searching tool;

    6.   Engaging in any activity constituting unfair competition with The Deal, or

constituting an infringement of The Deal's trademarks or trade name; and

      7.    Registering or applying to register as a trademark, service mark, trade name, Internet domain name or any other source identifier or symbol of origin, "dealpipeline" or "Deal Pipeline" or any other mark or name that infringes on or is likely to be confused with Plaintiff's trademarks or trade name.

      D.    That Defendant be directed to file with this Court and serve upon Plaintiff within thirty (30) days after service upon Defendant of any injunction herein, a report in writing and under oath setting forth in detail the manner and form in which Defendant has complied with the injunction.

      E.    That Defendant be required to account for all inventory of merchandise bearing words "dealpipeline" or "Deal Pipeline" and that it be required to destroy that inventory or provide it to Plaintiff.

      F.    That Defendant and all others in active concert or participation with Defendant take affirmative steps to dispel any false impression or confusion that has been created by Defendant's use of "dealpipeline" or "Deal Pipeline" as a trade name or trademark.

      G.    That Defendant immediately destroy any and all advertising, promotion, or marketing materials within their possession, custody or control that use the name or mark "dealpipeline" or "Deal Pipeline."

      H.    That Defendants account to Plaintiff for all Defendant's profits, gains and sums arising from the acts of infringement and unfair competition herein alleged.

      I.    That, pursuant to 15 U.S.C. § 1117(a) and the laws of New York, Plaintiff be awarded attorneys' fees, Defendant's profits, and damages suffered by Plaintiff.

      J.    That, pursuant to 15 U.S.C. § 1117(a), Plaintiff be awarded treble damages arising

from Defendant's intentional and willful conduct.

        K.      That, pursuant to N.Y.G.B.L. § 349(h), Plaintiff be awarded treble damages and attorneys' fees.

        L.      That, as provided for under the laws of New York, Plaintiff be awarded punitive damages arising from Defendant's intentional and willful conduct.

        M.      That Plaintiff be granted such other and further relief as this Court may deem just and equitable.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury for all issues and claims properly triable thereby.

Dated: New York, New York
       June 13, 2013

Respectfully submitted,

Orrick, Herrington & Sutcliffe LLP

By: _____
    Lisa T. Simpson

51 W. 52nd Street
New York, NY 10019
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
lsimpson@orrick.com

Attorneys for Plaintiff The Deal, L.L.C.

22

## VERIFICATION

STATE OF NEW YORK )
: ss.:
COUNTY OF NEW YORK )

Michael Crosby, being duly sworn, hereby deposes and says that he is the

Managing Director of The Deal, L.L.C., the Plaintiff in the within action, that he is duly

authorized to make this Verification on behalf of said Plaintiff, that he has read and is

familiar with the contents of the Verified Complaint in this action, and that the

allegations thereof are true to the best of his knowledge, information and belief.

_____
Michael Crosby

Sworn to before me this
13th day of June, 2013

_____
Notary Public

ELIZABETH Y. WALKER
Notary Public, State of New York
No. 01WA4974033
Qualified in Queens County
Commission Expires November 28, 2016
2014

# Exhibit A

Int. Cls.: 36 and 41

Prior U.S. Cls.: 100, 101, 102 and 107

**United States Patent and Trademark Office**

Reg. No. 3,653,698
Registered July 14, 2009

## SERVICE MARK
### PRINCIPAL REGISTER



THE DEAL, LLC (DELAWARE CORPORATION)
105 MADISON AVENUE
NEW YORK, NY 10016

FOR: PROVIDING INFORMATION IN THE FIELD OF MERGERS AND ACQUISITIONS VIA THE INTERNET; PROVIDING ONLINE SEARCHABLE DATABASES OF NEWS AND INFORMATION IN THE FIELD OF MERGERS AND ACQUISITIONS, IN CLASS 36 (U.S. CLS. 100, 101 AND 102).

FIRST USE 7-1-2008; IN COMMERCE 7-1-2008.

FOR: PROVIDING ONLINE MAGAZINES AND NEWSLETTERS IN THE FIELD OF MERGERS AND ACQUISITIONS, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 7-1-2008; IN COMMERCE 7-1-2008.

OWNER OF U.S. REG. NOS. 2,422,735, 2,716,175, AND 3,297,150.

THE COLOR(S) RED AND BLACK IS/ARE CLAIMED AS A FEATURE OF THE MARK.

THE MARK CONSISTS OF THE WORDING "THE DEAL PIPELINE" WITH THE WORDS "DEAL" AND "PIPELINE" UNDERNEATH THE WORDING "THE" AND WITH THE WORD "DEAL" IN THE COLORS RED AND BLACK, "THE" AND "PIPELINE" IN THE COLOR BLACK.

SER. NO. 77-558,969, FILED 8-29-2008.

ANNE MADDEN, EXAMINING ATTORNEY

# Exhibit B



**FLASTER GREENBERG**
ATTORNEYS AT LAW • A PROFESSIONAL CORPORATION

Four Penn Center
1600 John F. Kennedy Boulevard
2nd Floor
Philadelphia, PA 19103
(215) 279-9393
Fax: (215) 279-9394
www.flastergreenberg.com

JORDAN A. LaVINE
Member of the PA and NY Bars
Direct Dial: (215) 279-9389
E-Mail: jordan.lavine@flastergreenberg.com

April 29, 2013

*Via Email (daniel@dealdrive.com) and Overnight Mail*

Daniel K. Nenadovic, Founder
Dealdrive, Inc.
250 Park Avenue, 7th floor
New York, NY, 10177

Re: *The Deal Pipeline* Trademark of The Deal, LLC

Dear Mr. Nenadovic:

We represent The Deal, LLC ("The Deal"). The Deal has asked us to write you concerning your company's unauthorized use of a trademark that is confusingly similar to The Deal's registered *The Deal Pipeline* trademark, namely, Dealdrive's *dealpipeline* trademark.

Since 1999, The Deal has been a leader in sophisticated coverage of the "Deal Economy." Through *The Deal Pipeline*, The Deal provides unique and proprietary content that serves the news, information and idea generation needs of corporate and financial dealmakers, advisers, intermediaries and investors.

As noted above, The Deal has used for many years, and continues to use, the trademark *The Deal Pipeline* in connection with a financial transaction information and news service located at *www.thedeal.com*. *The Deal Pipeline* is a leading news site for the financial sector. *The Deal Pipeline* offers proprietary research and reporting, and includes a breaking news service, daily and weekly newsletters, a twice-daily report of the day's top stories, a research center with over a decade's worth of reporting, a database of over 117,000 deals, and an iPad application.

The Deal owns a registration for its *The Deal Pipeline* trademark in the U.S. Patent and Trademark Office, namely, U.S. Registration No. 3,653,698, issued July 15, 2009. By virtue of its long use and registration of *The Deal Pipeline* trademark, the trademark is well-known in the business community and is among The Deal's most valuable assets.

3135149 v1

Daniel K. Nenadovic, Founder
April 29, 2013
Page 2

It has very recently come to The Deal's attention that Dealdrive is promoting a software product under the trademark *dealpipeline*. At your company's website, the product is described as an "investment tracking tool" that has the following functionality:

> The software helps record, profile, and keep all investment pipeline activity organized and easily viewable for those weekly deal review meetings. The program also provides advanced reporting features for active intelligence on when and from whom deals are sourced, to-do lists, tasks, and investment stage processes

We are additionally aware that Dealdrive has sought registration of its *dealpipeline* trademark in the U.S. Patent and Trademark Office.

Dealdrive's use and registration of its *dealpipeline* trademark is likely to cause confusion with The Deal's registered *The Deal Pipeline* trademark. In addition to the respective marks being essentially identical, the focus of Dealdrive's software is closely related to the subject matter of The Deal's *The Deal Pipeline* service. The respective products and services are additionally promoted to the same and overlapping classes of persons, as evidenced by both Dealdrive and The Deal being named sponsors of the ACG's recent *Intergrowth 2013* conference in Orlando, Florida.

Accordingly, The Deal believes there is a strong likelihood that persons familiar with The Deal's established *The Deal Pipeline* service will believe mistakenly that Dealdrive's *dealpipeline* software is associated or affiliated with The Deal's services or that The Deal endorses Dealdrive's software product.

Based upon the foregoing, on behalf of The Deal, we ask that Dealdrive agree to immediately cease its use of the *dealpipeline* trademark and select a new trademark for its software product that is not confusingly similar to The Deal's registered trademark. We also ask that Dealdrive abandon its pending trademark application for the *dealpipeline* trademark.

We hope Dealdrive appreciates the spirit in which this letter is written and that this matter can be resolved amicably. Please be assured, however, that if Dealdrive does not agree to take the actions requested above, The Deal will have no choice but to take such further action against Dealdrive as is necessary to protect The Deal's valuable trademark rights.

Please let us hear from you by May 6, 2013.

Daniel K. Nenadovic, Founder
April 29, 2013
Page 3

     The offer of compromise contained in this letter is, of course, without prejudice to any action that may be necessary to protect the valuable rights of The Deal in its *The Deal Pipeline* trademark.

Very truly yours,

Jordan A. LaVine

Cc:    The Deal, LLC
       TheStreet, Inc.

# Exhibit C

# FOX HORAN & CAMERINI LLP

825 THIRD AVENUE

NEW YORK, NEW YORK 10022

ATTORNEYS AND COUNSELLORS
AT LAW

TELEPHONE:  (212) 480-4800
TELECOPIERS: (212) 269-2383
(212) 709-0248

May 13, 2013

**BY E-MAIL AND**
**CERTIFIED MAIL RETURN RECEIPT REQUESTED**

Jordan A. LaVine, Esq.
Flaster/Greenberg PC
Four Penn Center
1600 JFK Boulevard, 2nd Floor
Philadelphia, PA 19103
jordan.lavine@flastergreenberg.com

Re:   THE DEAL PIPELINE Trademark

Dear Mr. LaVine:

On behalf of Dealdrive, Inc. ("Dealdrive"), I write in response to your letter dated April 29, 2013 concerning THE DEAL PIPELINE mark ("Deal's Mark") owned by The Deal, LLC ("The Deal"). The allegations in your letter concerning Dealdrive's own DEALPIPELINE mark ("Dealdrive's Mark") are meritless for the following reasons.

Initially, the two marks are so dissimilar that there is virtually no possibility of a likelihood of confusion between them. While Deal's Mark is a word mark in a stylized form, Dealdrive's Mark is a design mark incorporating words and a prominent graphic. Even a cursory visual review demonstrates that they differ substantially in wording, color, style, layout, use of graphics, and overall commercial impression. *Compare* U.S. Ser. No. 85813216 (DEALPIPELINE) *with* U.S. Reg. No. 3653698 (THE DEAL PIPELINE). For these and other reasons, the two marks are wholly distinct from each other.

Moreover, Deal's Mark – essentially comprising three basic English words – refers unequivocally to the use of the phrase "deal pipeline," which, as you know, is a term of art used prevalently in the investment and business community and something The Deal itself failed to disclose during the prosecution of its own mark. *See* Exhibit A. Thus, aside from any improprieties in obtaining Deal's Mark, the wording merely describes the subject matter or use or purpose for the goods and services offered by The

Deal. Due to its descriptive nature, Deal's Mark is not a particularly strong source identifier for the goods being marketed by the company.

Additionally, the two companies use their respective marks in decidedly different ways in terms of the subject matter of goods and services.

Dealdrive is a mobile software company that develops mobile centric, best-practices based, work-flow applications targeting private company investors and executive teams. It uses DEALPIPELINE in connection with the development, marketing, and sale of a software application that is a "prospective investment tracking tool on the market." It not only "helps record, profile, and keep all investment pipeline activity organized and easily viewable for those weekly deal review meetings," but also "provides advanced reporting features for active intelligence on when and from whom deals are sourced, to-do lists, tasks, and investment stage processes" which aims to assist customers in "focusing less on administrative work and spending more time on closing deals." *See* https://dealdrive.com/apps_our-software/; *see also* U.S. Ser. No. 85813216 (DEALPIPELINE) (seeking registration for "[c]loud computing software for use in managing deal pipelines").

By contrast, The Deal is in the news and information business, publishing newspapers and newsletters and providing news reporting and research services to customers such as "top law firms, investment banks, private equity firms, hedge funds and corporations." *See* http://pipeline.thedeal.com/tdd/today/TodaysDeal.dl; *see also* U.S. Reg. No. 3653698 (THE DEAL PIPELINE) (seeking registration for "[p]roviding information in the field of mergers and acquisitions via the Internet; providing online searchable databases of news and information in the field of mergers and acquisitions" and "[p]roviding online magazines and newsletters in the field of mergers and acquisitions").

Both companies' customers are in marketplaces that are highly sophisticated, well educated, and financially astute. Accordingly, the individuals and entities who constitute both marketplaces are very much unlikely to suffer confusion of any kind because they not only have the ability to easily discern the differences between the companies and their respective goods and services, but are likely to purchase goods and services after careful consideration. In that regard, I note that, in your April 29 letter, you did not provide any examples of actual confusion resulting from the concurrent use of our respective clients' marks, suggesting that no such confusion exists. If you have any contrary evidence, please provide it to us.

For the foregoing reasons, Dealdrive maintains its own distinctive mark, and there has been no inappropriate use by Dealdrive of either its own mark or Deal's Mark. Dealdrive therefore denies each and every allegation set forth in your letter, will continue to use its own mark for its goods and services, and rejects your request for Dealdrive to abandon its pending trademark application.

This letter is not intended to be an exhaustive statement of Dealdrive's rights, remedies, or causes of action, and this letter is being sent without waiver of, or prejudice to, my client's rights to pursue legal action or to seek all orders, monetary remedies, and injunctive relief available, whether in law or equity, all of which are hereby expressly reserved.

Very truly yours,

FOX HORAN & CAMERINI LLP

*Rafael A. Ginebra* (sgn)

Rafael A. Ginebra

3

EXHIBIT A


**TIPPR**

Get Started Now

## Group Buying Glossary: Part 4


Customer
Successes!

# Exhibit D



# ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
51 WEST 52ND STREET
NEW YORK, NEW YORK 10019 6142

tel +1-212-506-5000
fax +1-212-506-5151
WWW.ORRICK.COM

Lisa T. Simpson
212 506-3767
lsimpson@orrick.com

June 4, 2013

BY E-MAIL AND FEDEX

Rafael A. Ginebra, Esq.
Fox Horan & Camerini LLP
825 Third Avenue
New York, New York 10022

Re:     THE DEAL PIPELINE Trademark of The Deal, L.L.C.

Dear Mr. Ginebra:

 This is in response to your letter of May 13, 2013 to Jordan A. LaVine of Flaster Greenberg PC regarding Dealdrive's unauthorized use of "dealpipeline" in violation of the rights of our client, The Deal, L.L.C., in its service and trademark THE DEAL PIPELINE. Orrick, Herrington & Sutcliffe LLP is now handling this matter for The Deal and its parent company, TheStreet, Inc. (www.thestreet.com).

 We have reviewed your letter and find it inaccurate in many respects. It fundamentally underestimates the strength of THE DEAL PIPELINE as a service mark of The Deal. That mark has been in use by The Deal continuously for nearly five years. As a leading news and information site for the financial sector, "The Deal Pipeline" is well-known and respected by the financial community. There is little question that your client's use of the same exact mark, in the same exact channels of trade, with the same exact consumer base is likely to cause confusion and mistake as to sponsorship or affiliation with our client. Moreover, it is highly likely that consumers will assume that your client's dealpipeline app and/or software platform is affiliated with, has been endorsed by, and/or is sponsored by The Deal.

 Your letter response, which simply indicates that your client intends to continue its infringing activity, is not acceptable, particularly in light of the importance of "The Deal Pipeline" to our client. We therefore have prepared the attached Complaint. This Complaint is unsigned and has not yet been filed, as The Deal would prefer to resolve this matter without the need for litigation. However, if Dealdrive does not agree in writing by June 11, 2013, that it will immediately cease all use of "dealpipeline," and also that it will expressly abandon its pending U.S. trademark



**ORRICK**

Rafael A. Ginebra, Esq.
Fox Horan & Camerini LLP
Page 2

application (Ser. No. 85/813,216) for "dealpipeline and design," The Deal intends to file and serve the attached Complaint, as well as file an Opposition in the U.S. Patent & Trademark Office against Dealdrive's pending trademark application, and will be forced to pursue its claims vigorously against Dealdrive in federal court.

Sincerely,

Lisa T. Simpson

Enclosure

cc:     The Deal, L.L.C.
        TheStreet, Inc.